**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YI FANG CHEN, individually and on behalf of her minor children M.P., Ma.P., and P.P., <br><br> Plaintiff, <br><br> v. <br><br> ZOHRAN MAMDANI, in his official capacity as Mayor of the City of New York; KAMAR H. SAMUELS, in his official capacity as Chancellor of the New York City Department of Education; and the NEW YORK CITY DEPARTMENT OF EDUCATION, <br><br> Defendants. | Case No. 1:26-cv-03355 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

    I.   The Specialized High Schools and the SHSAT ................................................. 2

    II.  The Discovery Program Before 2018 .............................................................. 4

    III. The 2018 Admission Policy Changes .............................................................. 5

    IV. Evidence of Discriminatory Purpose ............................................................... 6

        A.  Contemporaneous Public Statements ...................................................... 6

        B.  Internal DOE Documents ........................................................................ 8

        C.  Targeting of Asian-American Middle Schools ....................................... 10

    V.  M.P.'s Denial of Admission to Stuyvesant ..................................................... 10

    VI. Prior Litigation ................................................................................................ 12

DISCUSSION ..................................................................................................................... 13

    I.   Preliminary Injunction Standard ...................................................................... 13

    II.  Chen Is Likely to Succeed on the Merits of Her Equal Protection Claim ....... 13

        A.  The Discovery Program Changes Were Adopted with a Racial Purpose ................. 14

            1.  Defendants' Contemporaneous Statements Establish a Racially Discriminatory Purpose ................................................................................... 14

            2.  Internal DOE Documents Confirm the Racial Purpose ....................... 15

            3.  The ENI Threshold Was Deliberately Designed to Target Asian-American Middle Schools ........................................................................ 17

        B.  The Discovery Changes Have Caused Concrete Harm to M.P. ............... 18

        C.  The Policy Cannot Survive Strict Scrutiny ............................................. 19

            1.  Defendants Have No Compelling Interest ............................................ 19

            2.  The Policy Is Not Narrowly Tailored .................................................. 19

            3.  The Policy Violates The "Twin Commands" of Equal Protection ...... 21

        D.  The Pre-*SFFA* Denial of a Preliminary Injunction in *Christa McAuliffe* Does Not Affect Chen's Likelihood of Success ............................ 21

    III. Chen Is Likely to Succeed on Her Title VI Claim ........................................... 23

    IV. The Other Preliminary Injunction Factors Are Satisfied .................................. 24

        A.  M.P. Will Suffer Irreparable Harm Absent a Preliminary Injunction. ..... 24

        B.  The Balance of Equities and Public Interest Favor Injunctive Relief ...... 25

CONCLUSION ................................................................................................................... 25

CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMIT ................................. 27

CERTIFICATE OF COMPLIANCE ................................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001)......................................................................................................23

*Cacchillo v. Insmed, Inc.*,
638 F.3d 401 (2d Cir. 2011).........................................................................................13

*Chinese Am. Citizens All. of Greater N.Y. v. Adams*,
116 F.4th 161 (2d Cir. 2024) ................................................................................ *passim*

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*,
627 F. Supp. 3d 253 (S.D.N.Y. 2022)..........................................................................12

*Christa McAuliffe Intermediate Sch. PTO v. de Blasio*,
364 F. Supp. 3d 253 (S.D.N.Y. 2019)....................................................................12, 22

*Christa McAuliffe Intermediate Sch. PTO v. de Blasio*,
No. 1:18-cv-11657 (S.D.N.Y.)..........................................................................12, 19, 22

*Coronel v. Decker*,
449 F. Supp. 3d 274 (S.D.N.Y. 2020)..........................................................................25

*Deide v. Day*,
676 F. Supp. 3d 196 (S.D.N.Y. 2023)....................................................................15, 20

*Diaz v. N.Y.C. Bd. of Elections*,
335 F. Supp. 2d 364 (E.D.N.Y. 2004) ..........................................................................24

*Dr.'s Assocs., Inc. v. Stuart*,
85 F.3d 975 (2d Cir. 1996)............................................................................................25

*Fisher v. Univ. of Tex. at Austin*,
570 U.S. 297 (2013)......................................................................................................22

*Foulke by Foulke v. Foulke*,
896 F. Supp. 158 (S.D.N.Y. 1995)...............................................................................25

*Hayden v. County of Nassau*,
180 F.3d 42 (2d Cir. 1999)......................................................................................22–23

*Herrera v. N.Y.C. Dep't of Educ.*,
No. 1:21-CV-7555-MKV, 2024 WL 245960 (S.D.N.Y. Jan. 23, 2024)..................15

*MHANY Mgmt., Inc. v. Cnty. of Nassau*,
819 F.3d 581 (2d Cir. 2016).........................................................................................15

*Miller v. Johnson*,
    515 U.S. 900 (1995)..................................................................................................14

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984).....................................................................................24

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018).......................................................................................13

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................................................25

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)..............................................................................................20, 22

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)..................................................................................................14

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) .....................................................................17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    600 U.S. 181 (2023)....................................................................................... *passim*

*Tolbert v. Queens Coll.*,
    242 F.3d 58 (2d Cir. 2001)........................................................................................23

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) .........................................................................................24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)...........................................................................................13–14, 17

### Statutes

42 U.S.C. § 2000d..................................................................................................2, 23–24

N.Y. Educ. Law § 2590-g(12)(b) (1994) ........................................................................3–4

N.Y. Educ. Law § 2590-h(1)(b) (1998) ..........................................................................3–4

### Other Authorities

de Blasio, Bill, *Our Specialized Schools Have a Diversity Problem. Let's Fix It.*,
    Chalkbeat (June 2, 2018), https://chalkbeat.org/posts/ny/2018/06/02/mayor-
    bill-de-blasio-new-york-city-will-push-for-admissions-changes-at-elite-and-
    segregated-specialized-high-schools......................................................................6–7

*Demographic Snapshot 2020-21*, https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2016-17-to-2020-21-public.xlsx ................................................................................................................................10

*Demographic Snapshot 2024-25*, NYC Public Schools, https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2020-21-to-2024-25-public.xlsx .....................................3, 6, 11

*Demographic Snapshot 2024-25: Visual Guide*, NYC Public Schools, https://infohub.nyced.org/docs/default-source/default-document-library/2024-25-demographic-snapshot-summary.pdf ......................................................................3

Harris, Elizabeth A., & Hu, Winnie, *Asian Groups See Bias in Plan to Diversify New York's Elite Schools*, N.Y. Times (June 5, 2018), https://www.nytimes.com/2018/06/05/nyregion/carranza-specialized-schools-admission-asians.html .................................................................................................7

Hu, Winnie, *Elite New York High Schools to Offer 1 in 5 Slots to Those Below Cutoff*, N.Y. Times (Aug. 13, 2018) .......................................................................4

Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018), https://twitter.com/nycmayor/status/1003414958464487425....................................7

*Mayor De Blasio Details Plan To Diversify New York City's Elite High Schools*, CBS New York (June 3, 2018), https://www.cbsnews.com/newyork/news/de-blasio-diversify-elite-city-high-schools-plan/;.............................................................7

Press Release, Office of the Mayor, *Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools* (Jun. 3, 2018), https://a860-gpp.nyc.gov/concern/nyc_government_publications/nc580q26h ...................................................... *passim*

*Specialized High Schools*, NYC Public Schools, https://www.schools.nyc.gov/enrollment/enroll-grade-by-grade/specialized-high-schools ................................................................................................................3

Stuyvesant High School, *History of the School*, https://stuy.enschool.org/apps/pages/index.jsp?uREC_ID=126631&type=d&pREC_ID=251657&hideMenu=1 ............................................................3

*Title I Grants to Local Educational Agencies*, New York State Comptroller, https://www.osc.ny.gov/reports/budget/fed-funding-ny/title-i-grants-local-educational-agencies ....................................................................................................23

Zimmerman, Alex, *New Data Show How Few Black and Hispanic Students Benefit from New York City's Specialized High School Diversity Program*, Chalkbeat (Aug. 14, 2018), https://www.chalkbeat.org/posts/ny/2018/08/14/discovery-program-data-shsat/ ..........................................................4

**INTRODUCTION**

Plaintiff Yi Fang Chen is a Chinese immigrant and the mother of M.P., an eighth grader who recently scored 558 on New York City's Specialized High School Admissions Test (SHSAT). M.P. has long had a goal of attending Stuyvesant High School—the most selective of New York City's prestigious specialized high schools (SHSs). He missed admission to Stuyvesant by only three points. That three-point gap exists because in recent years Defendants manipulated the admission policy to reduce Asian-American access to the specialized high schools. Without those changes, M.P. would be headed to Stuyvesant this fall.

The admissions changes were initiated eight years ago, when the Mayor and the Chancellor of Education set out to solve what they saw as a "monumental injustice" at the SHSs: too many Asian students. Their solution was to transform the Discovery program—a historically small pathway for economically disadvantaged students who score just below the exam cutoff—into a 20-percent set-aside at every SHS. At the same time, they narrowed Discovery eligibility to students attending middle schools above an "Economic Need Index" (ENI) threshold they chose because internal modeling showed it would exclude heavily Asian middle schools that had long sent many students to the SHSs.

The policy was not subtle. Referring to the many Asian admittees, the Chancellor said he did not "buy into the narrative that any one ethnic group owns admission to these schools." And in internal documents, Department of Education (DOE) staff candidly described their plan to use the Discovery program as "a lever to admit more Black and Hispanic students." They also modeled the racial effects of different ENI thresholds and selected the one internally projected to reduce the Asian share of Discovery admittees from 64 percent to 38 percent.

In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) (*SFFA*), the Supreme Court made clear that government officials may not manipulate

1

admissions systems to produce race-based outcomes. And in *Chinese American Citizens Alliance of Greater New York v. Adams*, 116 F.4th 161 (2d Cir. 2024) (*CACAGNY*), the Second Circuit held—while considering *this very policy*—that if a plaintiff proves discriminatory intent, a negative effect on an individual Asian-American applicant is sufficient to trigger strict scrutiny. That disposes of the central legal question this case presents. What remains is whether the Discovery program changes were enacted with discriminatory intent (the record says yes, overwhelmingly), whether Chen's son was harmed (he was denied admission to Stuyvesant by three points, a margin the Discovery expansion created), and whether the policy can survive strict scrutiny (it cannot).

This Court should grant a preliminary injunction ordering that M.P. be admitted to Stuyvesant for the 2026–27 school year pending final resolution of this case. Chen is likely to succeed on the merits under both the Equal Protection Clause and Title VI of the Civil Rights Act of 1964. M.P. will suffer irreparable harm—the loss of his ninth-grade year at his preferred school—if forced to await final judgment. The balance of equities favors him. And the public has no interest in the continued enforcement of a policy that the evidence shows was adopted to disadvantage students because of their race.

## FACTUAL BACKGROUND

### I.    The Specialized High Schools and the SHSAT

New York City's specialized high schools are among the most academically rigorous public secondary schools in the United States. The "Big Three"—Stuyvesant, Bronx Science, and Brooklyn Tech—are especially distinguished.[1] *CACAGNY*, 116 F.4th at 165. Stuyvesant is the

---

[1] The other five SHSs are: Brooklyn Latin School; High School for Mathematics, Science and Engineering at City College; High School of American Studies at Lehman College; Staten Island Technical High School; and Queens High School for the Sciences at York College. *See Specialized High Schools*, NYC Public Schools, https://www.schools.nyc.gov/enrollment/enroll-grade-by-grade/specialized-high-schools. A ninth school, LaGuardia High School, is an arts school that bases admissions on a competitive audition and is not implicated here. *Id.*

most selective and has produced four Nobel Laureates and numerous leaders in science, law, and

public life.[2]

To ensure these schools maintain rigorous academic standards, New York State enacted

the Hecht-Calandra Act in 1971, which requires that:

> Admissions to the Bronx High School of Science, Stuyvesant High School and Brooklyn Technical High School and such similar further special high schools which may be established shall be solely and exclusively by taking a competitive, objective and scholastic achievement examination, which shall be open to each and every child in the city of New York in either the eighth or ninth year of study, without regard to any school district wherein the child may reside.

N.Y. Educ. Law § 2590-g(12)(b) (1994).[3] Pursuant to the statute, applicants rank their preferred

schools, take the SHSAT, and starting with the highest scorer, each student is offered admission

to his or her highest-ranked SHS with an available seat. *Id.* The SHSAT score of the last student

admitted to each school is that school's "cutoff" score. Stuyvesant consistently has the highest

cutoff; for the 2026–27 school year, it was 561, whereas the lowest score for admission to any

SHS through the exam—the overall cutoff—was 495. *Id.*

Admission to the SHSs has trended heavily Asian. According to City records, less than 20

percent of students in the New York City public school system are Asian, but approximately 60

percent of students at the SHSs overall are Asian, and Stuyvesant itself is over 70 percent Asian.[4]

---

[2] Stuyvesant High School, *History of the School*, https://stuy.enschool.org/apps/pages/index.jsp?uREC_ID=126631&type=d&pREC_ID=251657&hideMenu=1.

[3] The quoted text no longer appears in the statute books but has been incorporated by reference in the current version. *See* N.Y. Educ. Law § 2590-h(1)(b) (1998) ("admissions to the special schools shall be conducted in accordance with the law in effect on the date preceding the effective date of this section").

[4] *See Demographic Snapshot 2024-25: Visual Guide*, NYC Public Schools, https://infohub.nyced.org/docs/default-source/default-document-library/2024-25-demographic-snapshot-summary.pdf, at 5; *Demographic Snapshot 2024-25*, NYC Public Schools, https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2020-21-to-2024-25-public.xlsx. School-level demographic information on the "School" worksheet lists Stuyvesant as 71.8 Asian for the 2024–25 school year.

## II.    The Discovery Program Before 2018

Hecht-Calandra also authorizes a "[D]iscovery program" to afford "disadvantaged students of demonstrated high potential an opportunity to try the special high school program . . . ." N.Y. Educ. Law § 2590-g(12)(d) (1994). Eligibility requires that a student (1) take the SHSAT and score just below the overall cutoff; (2) be certified as disadvantaged; (3) be recommended as having "high potential" for the SHS program; and (4) complete a summer preparatory program. *Id.*[5] State law does not prescribe the size of the Discovery program, but it expressly requires that the program not "interfere[] with the academic level" of the schools. N.Y. Educ. Law § 2590-g(12)(d) (1994).

Between 2006 and 2015, Discovery accounted for roughly one to three percent of SHS admissions. *CACAGNY*, 116 F. 4th at 166. Decisions about whether and to what extent to participate in Discovery were left to the individual schools, and according to news reports, Stuyvesant did not participate in Discovery for many years.[6] As recently as 2018—the year before the challenged changes—it admitted only 23 students through the Discovery program out of a class of more than 800. Roper Decl. Ex. 1 ¶ 27.

Like the SHSs as a whole, the pre-2018 Discovery program served substantial numbers of Asian-American students, who made up about two-thirds of Discovery participants in the 2017–18 and 2018–19 school years. *Id.* ¶ 56.[7] To change the racial composition of the SHSs, Defendants had to design a policy that would redirect Discovery seats away from low-income Asian students toward low-income students of other races. As described below, that is exactly what they did.

---

[5] The original text about the Discovery program has been replaced by language noting that the "special schools shall be permitted to maintain a discovery program in accordance with the law in effect on the date preceding the effective date of this section." N.Y. Educ. Law § 2590-h(1)(b) (1998).

[6] Winnie Hu, *Elite New York High Schools to Offer 1 in 5 Slots to Those Below Cutoff*, N.Y. Times (Aug. 13, 2018), https://www.nytimes.com/2018/08/13/nyregion/discovery-program-specialized-schools-nyc.html.

[7] *See also* Alex Zimmerman, *New Data Show How Few Black and Hispanic Students Benefit from New York City's Specialized High School Diversity Program*, Chalkbeat (Aug. 14, 2018), https://www.chalkbeat.org/posts/ny/2018/08/14/discovery-program-data-shsat/ (asserting that Asian students represented 64% of Discovery in 2018 and 67% in 2017).

### III.     The 2018 Admission Policy Changes

Then-Mayor Bill de Blasio and then-Chancellor Richard Carranza decided that it was a problem that the racial demographics of the SHSs differed from those of the New York City public schools as a whole—specifically, that Asian students were, in their view, overrepresented and Hispanic and black students underrepresented. *CACAGNY*, 116 F.4th at 166–67. On June 3, 2018, they announced a two-pronged plan to change the racial composition of the SHSs. The first prong, challenged here, was an expansion and reorganization of the Discovery program.[8] The second prong, which would have required legislative repeal of Hecht-Calandra, was to eliminate the SHSAT altogether and replace it with reserved seats at the SHSs for the top-ranked students at each middle school in the City. *Id.* at 1. The Mayor and Chancellor publicly claimed that this second prong would increase black and Hispanic enrollment to 45 percent. *Id.* at 4. Although the legislative prong was not enacted, the two prongs were announced together as complementary parts of a single racial-balancing project.

Under the first prong, which did not require legislative approval, "the Discovery Program no longer would be a narrow alternative admission path. Instead, each SHS would now be required to set aside 20 percent of its seats for Discovery Program students, a dramatic increase from the 1 percent to 3 percent of seats that were previously reserved." *CACAGNY*, 116 F.4th at 167. Critically, the plan also narrowed Discovery eligibility, limiting participation to students attending middle schools with an Economic Need Index (ENI) of 0.6 (60 percent) or higher. *Id.*

ENI is a school-level metric, not a measure of individual economic need. A school's ENI is the average of its students' "Economic Need Values," which are based on factors like eligibility for public assistance, residency in temporary housing, and census-tract poverty data. *Id.* at 167

---

[8] Press Release, Office of the Mayor, *Mayor de Blasio and Chancellor Carranza Announce Plan to Improve Diversity at Specialized High Schools* (June 3, 2018), https://a860-gpp.nyc.gov/concern/nyc_government_publications/nc580q26h.

n.3.[9] Under the new policy, an individually disadvantaged student at a school with an ENI below 0.6 is ineligible for Discovery—even if the student is on public assistance or living in temporary housing. *Id.* at 165. The restriction thus conditions eligibility not on the economic circumstances of the child, but on which middle school the child attends. If the goal were simply to help low-income students, a school-level metric would be an odd choice; it makes sense only if the goal was to exclude students attending particular schools.

## IV.    Evidence of Discriminatory Purpose

There is overwhelming evidence that the Discovery changes were adopted for a racially discriminatory purpose. It can especially be seen in three sources: the decisionmakers' contemporaneous public statements; internal DOE documents produced in prior litigation; and the mathematical design of the ENI threshold.

### A.  Contemporaneous Public Statements

Mayor de Blasio and Chancellor Carranza did not disguise the racial purpose of their changes. In a *Chalkbeat* op-ed published the day before the plan was announced, de Blasio wrote that the SHS demographics were a "monumental injustice" and asked whether anyone could "look the parent of a Latino or black child in the eye and tell them their precious daughter or son has an equal chance to get into one of their city's best high schools."[10] On the day he announced the plan, he tweeted that "Stuyvesant High School just admitted almost a thousand students, but only ten of those students were African American and less than thirty were Latino. In a city that is majority

---

[9] A student is assigned an ENV of 1.0 if: he (a) "is eligible for public assistance from the NYC Human Resources Administration"; (b) "lived in temporary housing in the past four years"; or (c) "is in high school, has a home language other than English, and entered the NYC DOE for the first time within the last four years." Otherwise, a student's ENV is based on census-tract data reflecting the percentage of families with school-aged children living below the poverty level. *See Demographic Snapshot 2024-25*, "NOTES," *supra* n.4. Thus, each student's ENV, and by extension each school's ENI, falls between 0.0 and 1.0 (i.e., between 0% and 100%).

[10] Bill de Blasio, *Our Specialized Schools Have a Diversity Problem. Let's Fix It.*, Chalkbeat (June 2, 2018), https://chalkbeat.org/posts/ny/2018/06/02/mayor-bill-de-blasio-new-york-city-will-push-for-admissions-changes-at-elite-and-segregated-specialized-high-schools.

African American and Latino."[11] Clarifying that the purpose of his plan was racial balancing, the Mayor stated that the SHSs "need to look like New York City."[12] Chancellor Carranza, asked about the large proportion of Asian-American students at the specialized high schools, told WNYW that he did not "buy into the narrative that any one ethnic group owns admission to these schools"[13]—a statement that the Second Circuit treated as notable evidence of racial focus. *CACAGNY*, 116 F.4th at 167.

The City's official June 3, 2018, press release announcing the changes framed them as a response to the fact that "Black and Latino students comprise 9 percent of SHS offers, but 68 percent of all New York City high school students" and highlighted that "[t]he incoming freshman class at Stuyvesant High School only has 10 African-American students in a class of more than 900."[14] The release projected that the revised program would increase black and Hispanic offers from nine percent to sixteen percent—a racial arithmetic the City openly celebrated.[15]

Quotes in the press release from supportive public officials emphasized the racial focus of the proposed plan. For example, Mayor de Blasio is quoted as saying, "[f]or far too long our specialized high schools have failed to reflect the diversity of our city" and that "[w]e cannot let this injustice continue."[16] Board of Regents Chancellor Betty A. Rosa called the proposal a "bold plan to . . . . support greater equity at New York City's specialized high schools." *Id.* City Council member Ydanis Rodriguez stated that changing the SHS admissions policy "is an important step

---

[11] Mayor Bill de Blasio (@NYCMayor), Twitter (June 3, 2018), https://twitter.com/nycmayor/status/10034149 58464487425.

[12] *Mayor De Blasio Details Plan To Diversify New York City's Elite High Schools*, CBS New York (June 3, 2018), https://www.cbsnews.com/newyork/news/de-blasio-diversify-elite-city-high-schools-plan/; *see also* de Blasio, *supra* n.10 ("With these reforms, we expect our premier public high schools to start looking like New York City.").

[13] Elizabeth A. Harris & Winnie Hu, *Asian Groups See Bias in Plan to Diversify New York's Elite Schools*, N.Y. Times (June 5, 2018), https://www.nytimes.com/2018/06/05/nyregion/carranza-specialized-schools-admission-asians.html.

[14] Press Release, *supra* n.8.

[15] *Id.*; *see also* de Blasio, *supra* n.10 ("By itself, [the Discovery] change is expected to have only a modest effect, increasing black and Hispanic student enrollment to 16 percent, up from about 9 percent today.").

[16] Press Release, *supra* n.8.

in ensuring the student population reflects the city's population." *Id.* These and other quotes repeatedly connected the racial makeup of the SHSs to the proposed admissions changes.

The press release also announced de Blasio and Carranza's intention to eventually eliminate the SHSAT requirement entirely. They predicted that doing so would increase black and Hispanic enrollment at the SHSs to 45 percent—which was a prime motivator for their proposed changes to the SHS admissions process. *Id.*

### B. Internal DOE Documents

Internal DOE deliberations confirm that the racial purpose was central, not incidental, to the design of the new policy. For example, in an internal email less than a week before the policy was announced, DOE Director of Research and Policy Nadiya Chadha stated plainly: "we currently want to use the Discovery program as a lever to admit more Black and Hispanic students." Roper Decl. Ex. 2 at ChMc_E_ 066808. An April 2018 slide deck identified "[i]ncreas[ing] the diversity of the Specialized High Schools" as a "guiding principle" for the admissions changes and dismissed neutral alternatives—recommendation letters, interviews, writing assessments—because they were "unlikely to increase diversity of Specialized High Schools." Roper Decl. Ex. 3 at ChMc_E_114807, 114809. It noted that researchers had modeled other possible alternative admissions processes, but those alternatives did not "change the racial makeup" or result in "substantial change to the percent of Black and Hispanic students offered seats at Specialized High Schools." *Id.* at ChMc_E_114808. In contrast, expanding the Discovery program "to achieve more racial diversity" and coupling it with an ENI restriction would mean "[m]ore Black and Hispanic students would become eligible for Discovery." *Id.* at ChMc_E_114811, 114815.

In an April 2018 email chain, Deputy Chancellor Josh Wallack asked: "given the low percentage of black students in Discovery, how much bigger would the Discovery program need

8

to be at Bronx Science (as an example) to increase the percentage of black students by 1%?" Roper Decl. Ex. 4 at ChMc_E_065916. Chadha responded that "to increase the population of Black ninth graders" by 1%, the program would need to expand by a factor of 6, but coupling it with an ENI restriction "would not require as large a program, since it would be easier to target Black students directly for that program." *Id.*

DOE staff modeled the racial effects of different ENI thresholds and selected the one designed to produce the desired outcome. Chadha evaluated ENI cutoffs of 40 percent, 60 percent, and 80 percent and reported that the 60 percent model yielded a "more diverse" pool while the average proficiency of admitted students "barely change[d]." *Id.* at ChMc_E_065914. A chart prepared for City Hall projected that under the chosen policy, the Asian share of Discovery admittees would drop from 64 percent to 38 percent, while the black and Hispanic share would rise substantially:

| Ethnicity | Percent of students who received SHS offers through Discovery, for fall 2018 admissions [preliminary] | Model for expanded Discovery [20% of seats, 60% ENI minimum]* |
|---|---|---|
| Asian | 64% | 38% |
| Black | 10% | 22% |
| Hispanic | 12% | 31% |
| White | 11% | 7% |
| Other | 2% | 2% |
| Unknown | 2% | N/A |
| *Data for students who would have been eligible to apply for Discovery in summer 2017. Does not reflect income eligibility or student interest in participating. | | |

Roper Decl. Ex. 5 at ChMc_E_075252.

Another internal document—titled, aspirationally, "Making admissions to the Specialized High Schools more equitable for all students"—explained that the changes would mean that "offers to Black and Hispanic students across the Specialized High Schools would nearly double, going from ~9 percent currently to ~16%." Roper Decl. Ex. 6. DOE explicitly acknowledged that this approach would harm other racial groups, identifying as a "con" the "[r]esistance from those who would have received those seats in absence of change." Roper Decl. Ex. 7.

These working documents are not stray comments: they show that Defendants knew exactly what racial outcome they wanted, modeled alternatives, and selected the option designed to achieve it.

## C. Targeting of Asian-American Middle Schools

As reflected in the City's "Demographic Snapshot," under DOE's original 2016–17 ENI data, about 75% of the majority Asian-American middle schools with eighth-grade enrollment were projected to be excluded from Discovery, and nearly half were ultimately excluded under the 2017–18 data actually applied.[17] *See also CACAGNY*, 116 F.4th at 176–77. By contrast, only 15 of the 185 majority-black middle schools (about 8 percent) and just 7 of 232 majority-Hispanic middle schools (about 3 percent) were excluded. *Id.*

The newly adopted ENI threshold thus excluded majority-Asian schools at a vastly higher rate than majority-black and majority-Hispanic schools. Combined with the fact that Asian Americans already made up roughly two-thirds of Discovery participants under the pre-2018 rules, the targeting analysis makes the design unmistakable: the 0.6 ENI restriction was selected to produce a desired racial outcome of fewer Asians at the SHSs.

## V.    M.P.'s Denial of Admission to Stuyvesant

Plaintiff Yi Fang Chen is a Chinese immigrant, naturalized U.S. citizen, and mother of three—including M.P., an eighth grader at I.S. 239, Mark Twain Intermediate School for the Gifted and Talented. Chen Decl. ¶¶ 3, 5–6. Although she moved to the United States as a teenager, speaking little English, Chen eventually earned a Ph.D. in statistics from Stanford University and now works as a data scientist in Manhattan. *Id.* ¶¶ 3–5. For years, Chen and her family have

---

[17] *See Demographic Snapshot 2020-21*, https://infohub.nyced.org/docs/default-source/default-document-library/demographic-snapshot-2016-17-to-2020-21-public.xlsx. According to the "School" spreadsheet, in 2016–17, there were 23 schools with eighth-grade enrollment that were more than 50% Asian; 18 of them had an ENI under 0.6. In 2017-18, there were 24 such schools, and 11 of them had an ENI under 0.6.

planned for M.P. to attend Stuyvesant, which they consider the high school that will give him the best education and opportunities. *Id.* ¶¶ 7–8. When M.P. registered for the SHSAT in the fall of 2025, he listed Stuyvesant as his first choice. *Id.* ¶ 11.

M.P. learned in March 2026 that he scored 558 on the SHSAT. *Id.* ¶ 12. That score would have been sufficient to gain admission to Stuyvesant in 2025, when the cutoff was 556. *Id.* ¶ 13. *See also* Roper Decl. Ex. 8 (Cut Score for Non-Discovery For Fall 2025 Admissions). But it was three points below the 2026 cutoff of 561. Chen Decl. ¶ 13. As a result, M.P. was denied admission to Stuyvesant and instead offered admission to his second-choice school. *Id.*

The three-point gap between M.P.'s score and the 2026 Stuyvesant cutoff is directly traceable to the Discovery expansion. The 20-percent Discovery set-aside removed at least 160[18] seats at Stuyvesant from the standard SHSAT admissions pool and reserved them for students who scored below the overall SHSAT cutoff of 495. Thus, students admitted to Stuyvesant through Discovery for 2026–27 scored at least 66 points below students admitted through the standard SHSAT process. Returning those 160+ seats to the standard pool would lower the Stuyvesant cutoff well below M.P.'s score of 558. That conclusion is supported by DOE's own internal modeling. An internal DOE analysis concluded that setting aside twenty percent of seats for Discovery increased the Stuyvesant cutoff score by 10 points—and increased the cutoff at every SHS by at least 7 points. Roper Decl. Ex. 8.[19]

Because M.P. attends Mark Twain Intermediate School, which has an ENI below 0.6, he is ineligible for the Discovery program for Stuyvesant regardless of his economic circumstances.

---

[18] Stuyvesant's incoming class is at least 800 students, meaning the 20-percent Discovery expansion sets aside at least 160 seats per year for students admitted with scores below the overall SHSAT cutoff. *See Demographic Snapshot 2024-25*, *supra* n.4 (listing Stuyvesant class sizes on the "School" worksheet).

[19] The last two columns calculate SHSAT cutoff scores using a 20% Discovery set-aside versus the original Discovery size. The smallest increase is 7 points (at Staten Island Tech), and Stuyvesant's cutoff score increases 10 points, from 552 to 562. Although this analysis was done using 2019 data, DOE could conduct the same analysis using 2025 data, which is sure to show a similar effect.

11

Chen Decl. ¶ 16. Mark Twain is precisely the kind of high-performing middle school that DOE's own documents identify as the target of the ENI restriction—confirming that the policy was designed to exclude students like M.P.

## VI. Prior Litigation

In December 2018, a coalition of plaintiffs—then including Chen—filed suit challenging the Discovery changes. *Christa McAuliffe Intermediate Sch. PTO v. de Blasio*, No. 1:18-cv-11657 (S.D.N.Y.). In early 2019, the district court denied a preliminary injunction and dismissed Chen for lack of standing because it considered M.P., then in first grade, too young for his injury to be imminent. *Christa McAuliffe Intermediate Sch. PTO v. de Blasio*, 364 F. Supp. 3d 253, 272 (S.D.N.Y. 2019). The dismissal was jurisdictional, not on the merits.

The remaining plaintiffs proceeded to summary judgment, which the district court granted on the ground that they had not shown that the new admission policy caused an aggregate disparate racial impact on Asians. *Christa McAuliffe Intermediate Sch. PTO, Inc. v. De Blasio*, 627 F. Supp. 3d 253 (S.D.N.Y. 2022). On appeal, the Second Circuit reversed. *CACAGNY*, 116 F.4th 161. It held that aggregate disparate impact is not a required element of an equal protection claim; if discriminatory intent is proven, a negative effect on individual Asian-American applicants is sufficient to trigger strict scrutiny. *Id.* at 165. The Second Circuit also observed that expert evidence showed that the number of Asian students receiving offers to Stuyvesant and Bronx Science had declined under the revised criteria, further supporting the equal protection claim. *Id.* at 169, 178.

In the years since she was dismissed from the other lawsuit, Chen's son has taken the SHSAT, received his score, and is one of a growing list of Asian students who were denied admission to Stuyvesant because of the Discovery expansion.

**DISCUSSION**

**I.      Preliminary Injunction Standard**

A party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). A requested injunction that is "mandatory" as opposed to "prohibitory" is permitted on a "clear showing" of likelihood of success. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011). However, the distinction between mandatory and prohibitory relief is often "more semantic than substantive." *N. Am. Soccer League*, 883 F.3d at 36 n.4. The relief Chen seeks—restoring M.P. to the position he would have occupied absent the unconstitutional policy—is more naturally characterized as prohibitory, because it asks the Court to prevent Defendants from continuing to enforce the discriminatory set-aside against him.

**II.     Chen Is Likely to Succeed on the Merits of Her Equal Protection Claim**

In 2023, the Supreme Court reaffirmed that the Equal Protection Clause does not tolerate the government allocating educational opportunity based on race. *SFFA*, 600 U.S. 181. Although the admissions policies in *SFFA* considered race expressly, the Second Circuit has "repeatedly re-affirmed that a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect." *CACAGNY*, 116 F.4th at 171 (citation omitted). When a facially neutral policy is adopted with discriminatory purpose and has a discriminatory effect, strict scrutiny applies. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–66 (1977). This "daunting" standard of constitutional review is virtually always fatal. *SFFA*, 600 U.S. at 206–07. It requires proof that the policy is narrowly tailored to further a compelling governmental interest. *Id.*

13

Here, Chen is likely to establish every element of this framework. Although facially neutral, the SHS admissions changes were adopted with discriminatory purpose. They have caused concrete harm to M.P., a Chinese-American applicant who would have been admitted to his preferred school but for the policy. And they cannot survive strict scrutiny.

**A.   The Discovery Program Changes Were Adopted with a Racial Purpose**

*Arlington Heights* identified nonexclusive categories of "circumstantial and direct evidence" relevant to discriminatory purpose: the impact of the action, the historical background, departures from normal procedure, and "legislative or administrative history"—"especially where there are contemporary statements by members of the decisionmaking body." 429 U.S. at 266–68. Discriminatory purpose is established when decisionmakers acted "at least in part 'because of,' not merely 'in spite of,' [the policy's] adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Here, every factor points in the same direction: that Chen will likely be able to establish a discriminatory purpose.

1.   Defendants' Contemporaneous Statements Establish a Racially Discriminatory Purpose

Contemporaneous statements by decisionmakers are "[t]he clearest case" of discriminatory purpose. *Arlington Heights*, 429 U.S. at 266. It can sometimes be difficult to divine the intent behind a facially neutral policy. *See Miller v. Johnson*, 515 U.S. 900, 914 (1995). But here, Defendants have never tried to conceal their racial intentions; they have proudly announced them. *See supra* Background Part IV.A.

The City's official press release framed the Discovery changes as a response to the racial composition of the SHSs and celebrated that the changes would nearly double the black and Hispanic share.[20] Statements by Chancellor Carranza and Mayor de Blasio only reinforce that these policies were adopted as an explicit effort to racially balance the admissions process. Carranza's

---

[20] Press Release, *supra* n.8.

assertion that he does not "buy into the narrative that any one ethnic group owns admission to these schools" is direct evidence that decisionmakers believed there were too many Asian-American children at the SHSs. *CACAGNY*, 116 F.4th at 167.[21] Likewise, de Blasio framed the issue in expressly racial terms by calling past admissions unfair to Latino and black children; publicly emphasizing that Stuyvesant admitted too few black and Hispanic students; and tying Discovery expansion to his mandate that the SHSs "need to look like New York City."[22]

In *Deide v. Day*, the court preliminarily enjoined executive orders intended to limit services available to migrants after canvassing the "contemporaneous comments" of county "decision-maker[s]," and determining that discrimination was a "motivating factor" behind the orders. 676 F. Supp. 3d 196, 222 (S.D.N.Y. 2023). And strikingly similar race-based comments by de Blasio and Carranza—including statements that city officials should "look like New York City"—have been accepted in this District as evidence of unlawful race-based decision-making. *Herrera v. N.Y.C. Dep't of Educ.*, No. 1:21-CV-7555-MKV, 2024 WL 245960, at *1–2, *7–8 (S.D.N.Y. Jan. 23, 2024). Notably, the Second Circuit has affirmed findings of racial motivation on far less evidence. *See, e.g.*, *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 608–11 (2d Cir. 2016) (finding discriminatory intent where record contained only "code words" about neighborhood "character" and no direct racial statements).

### 2. Internal DOE Documents Confirm the Racial Purpose

DOE's internal deliberations—produced in discovery in the *CACAGNY* litigation—confirm that the racial purpose was central, not incidental, to the design of the policy. *See supra* Background Part IV.B.

---

[21] Of course, Chen does not claim her son "owns" admission into Stuyvesant—only that he should not be disadvantaged because of race.

[22] *See supra* n.10 & 11.

Less than a week before the new policy was announced, DOE acknowledged its intent to "use the Discovery program as a lever to admit more Black and Hispanic students." Roper Decl. Ex. 2 at ChMc_E_066808. Internal presentations acknowledged that racial diversity was a "guiding principle[]" and dismissed neutral alternatives—recommendation letters, interviews, writing assessments—because they were "unlikely to increase diversity." Roper Decl. Ex. 3 at ChMc_E_114807, 114809. DOE staff understood that the changes would provoke resistance "from those who would have received those seats in absence of change," (Roper Decl. Ex. 7)—students like M.P.—and were fully aware that "SHS admission is a zero-sum game in that admitting more students from a particular demographic means admitting fewer from other demographics," *CACAGNY*, 116 F.4th at 167.

Perhaps most damning, DOE staff modeled the racial effects of different ENI thresholds in an effort to maximize the racial effects of the changes, noting that a 60 percent model would yield a "more diverse" pool while not substantially dropping student proficiency and that adding an ENI restriction to the Discovery program would make it "easier to target Black students directly for that program." Roper Decl. Ex. 4 at ChMc_E_065914, ChMc_E_065916). A chart prepared for the Mayor's office projected exactly their intent: the Asian share of Discovery admittees was projected to drop from 64 percent to 38 percent, while the black and Hispanic shares would more than double. Roper Decl. Ex. 5 at ChMc_E_075252.

The documents show that DOE and City Hall knew exactly what racial outcome they wanted, modeled alternatives to determine which would produce that outcome, and selected the option designed to achieve it. Internal documents reflecting this type of predetermined discriminatory outcome are powerful evidence of discriminatory purpose. In *Saget v. Trump*, for example, the court granted a preliminary injunction after examining the "specific sequence of

16

events leading up to the challenged decision" and finding that the internal deliberative record was "suggestive of a pre-determined outcome not anchored in an objective assessment, but instead a politically motivated agenda" intended to limit the entry of certain immigrants into the country. 375 F. Supp. 3d 280, 372 (E.D.N.Y. 2019). Among other things, the court observed that government officials' internal "solicitati[on of] new information to comport with a predetermined . . . decision . . . raises eyebrows on the motivation behind the decision." *Id.* The same is true here.

### 3. The ENI Threshold Was Deliberately Designed to Target Asian-American Middle Schools

The design of the ENI threshold confirms what the documents say. *See supra* Background Part IV.C. DOE projected that a 0.6 ENI threshold would exclude 3 out of every 4 majority-Asian middle schools from Discovery, and the actual effect was to exclude majority-Asian schools at a far greater rate than majority-black and majority-Hispanic schools. *Id.* No genuinely neutral application of an economic criterion would produce that disparity.

In *Arlington Heights*, the Supreme Court noted that "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." 429 U.S. at 266 (citations omitted). *See also Saget*, 375 F. Supp. 3d at 373–74 (noting the solicitation of data intended to support a predetermined discriminatory result). The only explanation for the striking disparity in exclusion rates is that Defendants chose the 0.6 ENI threshold specifically because it would exclude middle schools historically sending many Asian-American students to the SHSs. Simply expanding Discovery would likely have admitted *more* Asian-American students, not fewer. Only by layering a carefully selected ENI restriction on top of the expansion could Defendants hope to produce the racial outcome they wanted.

**B. The Discovery Changes Have Caused Concrete Harm to M.P.**

Under the Second Circuit decision in *CACAGNY*, an individual Asian-American applicant who is harmed by the Discovery changes satisfies the discriminatory-effect element of an equal protection claim. 116 F.4th at 165. That decision expressly rejected the argument that plaintiffs must prove an aggregate disparate impact and held that a "negative effect or harm from [a] discriminatory policy on individual Asian-American students applying to the SHSs would be sufficient to trigger strict scrutiny review." *Id.* Even though the evidence showed—contrary to DOE expectations—that there was a small overall increase in Asian-American enrollment at the SHSs in the first year under the new criteria, there was still "sufficient evidence . . . that the revised Discovery Program has a discriminatory effect on Asian-American applicants seeking admission to SHSs." *Id.* at 176. That is not only because "a large group of Asian-American students at certain middle schools across New York City was excluded from the revised Discovery Program under the new criteria," but also because expert analysis showed that Asian-American students were denied admission to Stuyvesant and Bronx Science under the revised criteria. *Id.* at 176–79.

M.P. is exactly the kind of individual Asian-American applicant the Second Circuit had in mind. He scored 558 on the 2026 SHSAT—three points below Stuyvesant's cutoff of 561. Chen Decl. ¶ 12. His score would have qualified him for Stuyvesant were it not for the removal of at least 160 seats from the standard SHSAT admissions pool. Returning those seats would lower the Stuyvesant cutoff well below M.P.'s score—a conclusion confirmed by DOE's own internal modeling showing that reserving 20 percent of seats for Discovery increased the Stuyvesant cutoff by 10 points. Roper Decl. Ex. 8. Under *CACAGNY*, that is enough to show a discriminatory effect. 116 F.4th at 171.

M.P. is also harmed because his middle school has an ENI below 0.6—making it one of the schools specifically targeted by the policy. *See supra* Background Part IV.C. That M.P. attends

18

one of the excluded schools reinforces that the policy was designed to disadvantage students like him, and under *CACAGNY*, the combination of the seat reduction and the targeting of his school is sufficient to establish discriminatory effect.

### C. The Policy Cannot Survive Strict Scrutiny

Because Chen will likely be able to demonstrate both discriminatory purpose and discriminatory effect, Defendants must satisfy the "daunting two-step examination" of strict scrutiny. *SFFA*, 600 U.S. at 206. That means proving that their policy is narrowly tailored to serve a compelling government interest. *Id.* They cannot make either showing.

1. <u>Defendants Have No Compelling Interest</u>

After *SFFA*, the Supreme Court recognizes only two government interests compelling enough to sustain a racially discriminatory program: (1) "remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and (2) "avoiding imminent and serious risks to human safety in prisons." *SFFA*, 600 U.S. at 207. Neither applies here. Defendants cannot identify any prior constitutional or statutory violation that the Discovery changes remediate, and there is no safety rationale.

Moreover, public statements and internal documents show that Defendants' true interest was racial balancing, which is "patently unconstitutional." *SFFA*, 600 U.S. at 223 (citation omitted). But even if Defendants were to claim an interest in increasing "diversity" at the SHSs, as they did in the *Christa McAuliffe* litigation, *SFFA* squarely rejected that interest, holding that such an ill-defined goal "cannot be subjected to meaningful judicial review" and is "not sufficiently coherent for purposes of strict scrutiny." *Id.* at 214.

2. <u>The Policy Is Not Narrowly Tailored</u>

Even if Defendants could articulate a proper compelling interest, the Discovery program changes are not narrowly tailored. A policy is narrowly tailored only if it is necessary to achieve a

compelling interest and has a logical endpoint. *SFFA*, 600 U.S. at 213–30. The Discovery changes fail on both counts.

First, the policy is not necessary to achieve any compelling interest. It is notable that DOE considered and rejected neutral alternative ways to revamp the SHS admission policy—such as holistic review, interviews, and recommendation letters—because they would not produce the desired racial effect. Roper Decl. Ex. 3 at ChMc_E_114809. A means that is chosen *because* it will produce a race-conscious outcome, in preference to neutral alternatives, is the opposite of a "last resort." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 790 (2007) (Kennedy, J., concurring). *See also Deide*, 676 F. Supp. 3d at 225 (executive order was not narrowly tailored to a "legitimate concern to preserve financial resources" because "local governments 'may not accomplish such a purpose by invidious distinctions between classes of its citizens.'") (quotation omitted). And if the goal was expanding opportunity for the economically disadvantaged, Defendants could have pursued any number of genuinely race-neutral measures.

Instead, Defendants chose a mechanism designed to change the racial composition of the SHSs by denying opportunities to one set of students and redistributing them to others. They used ENI as a blunt proxy for race: a low-income Asian-American student at a school just below the threshold is excluded, while a similarly situated student at a school above the threshold is eligible. The policy predictably excludes many of the very disadvantaged students Discovery was supposedly designed to help. In that respect, it suffers from the same basic defect identified in *SFFA*: the government's chosen categories are too crude, overinclusive, and underinclusive to satisfy narrow tailoring.

Second, the policy is not narrowly tailored because it has no logical endpoint. *SFFA* held that race-based decision-making in education must have a meaningful stopping point. 600 U.S. at

20

221–22. Nothing in Defendants' policy identifies any limiting principle, measurable end goal, or point at which the racial tinkering will stop. To the contrary, the Discovery revisions were adopted as one step in an ongoing effort to change the racial composition of the SHSs. That is open-ended racial balancing, and the Constitution forbids it.

### 3. The Policy Violates The "Twin Commands" of Equal Protection

*SFFA* held that any admissions policy must comply with "the twin commands of the Equal Protection Clause": that race "may never be used as a 'negative'" and that it "may not operate as a stereotype." 600 U.S. at 218. The Discovery changes violate both commands. Defendants revised the Discovery program to reduce Asian-American access to the specialized high schools and redistribute opportunities to other racial groups. *See* Roper Decl. Ex. 2 at ChMc_E_ 066808 ("[W]e currently want to use the Discovery program as a lever to admit more Black and Hispanic students."). In selecting an ENI threshold because DOE modeling showed it would reduce Asian-American admissions, Defendants used race as a negative in the admissions process. And the policy rests on the stereotype that there were "too many" Asian Americans at the SHSs.

That Defendants have operated through a proxy rather than an explicit racial classification makes no difference. As *SFFA* put it: "What cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows, and the prohibition against racial discrimination is levelled at the thing, not the name." 600 U.S. at 230 (cleaned up).

### D. The Pre-*SFFA* Denial of a Preliminary Injunction in *Christa McAuliffe* Does Not Affect Chen's Likelihood of Success

In 2019, the court denied a preliminary injunction in *Christa McAuliffe*, allowing the Discovery changes to go into effect. 364 F. Supp. 3d at 283. That ruling does not control here, for two reasons.

First, the court assumed "that increasing racial diversity in the specialized high schools is

21

a compelling government interest." *Id.* That assumption cannot stand after *SFFA*, which squarely rejected the argument that an ill-defined interest in "diversity" can justify race-conscious admissions. 600 U.S. at 214–15. The Supreme Court has made clear that "[r]acial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 311 (2013) (quoting *Parents Involved*, 551 U.S. at 732). What Defendants call "diversity" is racial balancing in its most transparent form: they openly described the goal of making the racial composition of the SHSs "look like New York City,"[23] and their plan to use Discovery as a "lever to admit more Black and Hispanic students," Roper Decl. Ex. 2 at ChMc_E_ 066808. That is not a compelling interest. It is the very interest the Supreme Court has rejected.

Second, the court relied on the Second Circuit's decision in *Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir. 1999), for the proposition that racial preferences may be appropriate to remedy past discrimination "even in the absence of specific and identified discrimination." 364 F. Supp. 3d at 278 (cleaned up). But *SFFA* limited any remedial use of race to "specific, identified instances of past discrimination that violated the Constitution or a statute." 600 U.S. at 207. That forecloses reliance on *Hayden*'s broader framing. And in any event, *Hayden* is factually inapposite: there, a county redesigned a police entrance exam to reduce conceded past discrimination and the revised exam "was administered to all of the 25,000 candidates in identical fashion, regardless of race." 180 F.3d at 51. Here, by contrast, Defendants did not administer a neutral process identically to all applicants. They created a set-aside aided by a racial proxy—reducing the seats available through the SHSAT while categorically excluding students at targeted middle schools from the alternative pathway. That is a fundamentally different policy, and *Hayden* does not support it.

---

[23] *See* sources cited *supra*, n.10–12.

### III.    Chen Is Likely to Succeed on Her Title VI Claim

Chen is also likely to succeed on her independent Title VI claim against the DOE. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. It creates a private right of action for intentional discrimination by recipients of federal funds. *See Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001). And the DOE receives substantial federal education funding and is therefore subject to Title VI's prohibition.[24]

A Title VI plaintiff alleging intentional discrimination must show that discrimination was a "substantial" or "motivating" factor in the challenged decision. *Tolbert v. Queens Coll.*, 242 F.3d 58, 69–70 (2d Cir. 2001). That standard is easily satisfied here. Internal DOE documents show that racial rebalancing was not merely a side effect of the Discovery changes but a primary objective. DOE staff described the program changes as "a lever to admit more Black and Hispanic students." Roper Decl. Ex. 2 at ChMc_E_ 066808. DOE modeled the racial effects of different ENI thresholds and selected the one projected to cut the Asian share of Discovery admittees nearly in half—from 64 percent to 38 percent. Roper Decl. Ex. 5 at ChMc_E_075252. And the City's own press release celebrated the projected increase in Black and Hispanic offers.[25] Race was not merely a motivating factor in the Discovery changes—it was the driving force behind them.[26]

In sum, the race-based manipulation of Discovery removed one fifth of the standard-track

---

[24] *See Title I Grants to Local Educational Agencies*, New York State Comptroller, https://www.osc.ny.gov/reports/budget/fed-funding-ny/title-i-grants-local-educational-agencies

[25] *See* Press Release, *supra* n.8.

[26] This evidence is sufficient even to satisfy the more demanding but-for causation standard cited in Justice Gorsuch's *SFFA* concurrence. 600 U.S. at 288–90 (Gorsuch, J., concurring). But for the race of Asian-American students, DOE would not have expanded and restructured the Discovery program as it did.

seats at Stuyvesant from the standard admission pool, raising the cutoff above his score. Without that change, the Stuyvesant cutoff would have been lower, and M.P. would have been admitted. That is sufficient to establish Title VI liability.

## IV.    The Other Preliminary Injunction Factors Are Satisfied

### A.  M.P. Will Suffer Irreparable Harm Absent a Preliminary Injunction.

"Irreparable harm is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (citation and quotation omitted). *See also Diaz v. N.Y.C. Bd. of Elections*, 335 F. Supp. 2d 364, 367 (E.D.N.Y. 2004) (an equal protection injury satisfies the irreparable harm requirement). That principle alone establishes irreparable harm here.

But the irreparable harm to M.P. is not merely doctrinal. He stands to lose an irreplaceable educational opportunity. For years, M.P. and his family have planned and prepared for him to attend Stuyvesant, which they believe will provide him the best education and opportunities. Chen Decl. ¶¶ 7–9. A year—or more—excluded from Stuyvesant is not a harm that can be remedied by damages after trial. *Id.* ¶¶ 17–18. If M.P. is forced to start at his second-choice school this fall, he will at best be able to seek tenth-grade admission to Stuyvesant next year. *Id.* ¶ 19. But the coursework, the teachers, the peer cohort, the extracurricular offerings, the college-counseling relationships, and the friendships formed in the critical ninth-grade year cannot be reconstructed after the fact. As this District has recognized, because of the "unique" nature of educational experience, "the loss of an opportunity to attend a particular school is irreparable injury in the

24

sense that monetary damages cannot readily be fixed or, for that matter, compensate for the lost opportunity." *Foulke by Foulke v. Foulke*, 896 F. Supp. 158, 160–61 (S.D.N.Y. 1995).

### B. The Balance of Equities and Public Interest Favor Injunctive Relief

When the government is the party opposing relief, the public-interest factor "merges" with the balance of equities. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, any suggested harm to Defendants from an injunction admitting M.P. to Stuyvesant is minimal. Admitting one additional student will not disrupt the operation of the school or the DOE. Stuyvesant admits more than 800 students each year; one more will not meaningfully affect class sizes, facilities, or resources. Nor is Chen asking the Court to dismantle the Discovery program or to override the SHSAT. She is asking only that her son be admitted to the school he would have attended but for an unconstitutional policy. To the extent Defendants argue that this will impose administrative burdens, that argument has no weight against constitutional rights. *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) (recognizing that the "public interest is best served by ensuring the constitutional rights of [the plaintiff] are upheld") (quotation omitted).

### CONCLUSION

The Court should grant the motion for a preliminary injunction and order that M.P. be admitted to Stuyvesant High School for the 2026–27 school year pending resolution of this case.[27]

---

[27] No security should be required. "[T]he District Court is vested with wide discretion in the matter of security" and should not require a bond where, as here, Defendants will not be financially harmed by an injunction. *Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (quotation omitted).

Dated April 27, 2026.

Respectfully Submitted,

 /s/ Dean McGee

Glenn E. Roper, Colo. Bar No. 38723*          Dean McGee, N.Y. Bar No. 5135884
PACIFIC LEGAL FOUNDATION                 Christopher D. Barnewolt, D.C. Bar No. 90020413*
1745 Shea Center Dr., Ste. 400                Caitlyn Kinard, D.C. Bar No. 90029259*
Highlands Ranch, CO 80129                 PACIFIC LEGAL FOUNDATION
Telephone: (916) 419-7111                 3100 Clarendon Boulevard, Ste. 1000
Email: GERoper@pacificlegal.org           Arlington, VA 22201
                                          Telephone: (202) 888-6881
                                          Email: DMcGee@pacificlegal.org
                                          Email: CKinard@pacificlegal.org
                                          Email: CBarnewolt@pacificlegal.org

*Counsel for Plaintiff Yi Fang Chen, individually*
*and on behalf of her minor children M.P., Ma.P., and P.P.*

*pro hac vice motions pending

26

**CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMIT**

I certify that this memorandum complies with the applicable word-count limitation. I relied on the word count generated by the word-processing program used to prepare this memorandum. According to that program, the memorandum contains 8,135 words.

Dated April 27, 2026.

/s/ Dean McGee

**CERTIFICATE OF COMPLIANCE**

I certify that Plaintiff's Motion for Preliminary Injunction and supporting documents will be served upon Defendants along with the Complaint and Summons.

Dated April 27, 2026.

/s/ Dean McGee

28